1  Laurence M. Rosen, Esq. (SBN 219683)
2  THE ROSEN LAW FIRM, P.A.
   355 South Grand Avenue, Suite 2450
3  Los Angeles, CA  90071
   Telephone: (213) 785-2610
4  Facsimile: (213) 226-4684
   Email: lrosen@rosenlegal.com
5
6  Counsel for Plaintiff

7              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
8

| | |
|---|---|
| 9  ADAM FISHMAN, DERIVATIVELY AND ON BEHALF OF CYTRX CORPORATION, | No.: |
| Plaintiff, | |
| vs. | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR: |
| STEVEN A. KRIEGSMAN, DANIEL LEVITT, JOHN Y. CALOZ, BENJAMIN S. LEVIN, DAVID J. HAEN, LAUREN TERRADO, MAX LINK, MARVIN SELTER, LOUIS IGNARRO, JOSEPH RUBINFELD, AND RICHARD WENNEKAMP. | (1) BREACH OF FIDUCIARY DUTY; (2) CORPORATE WASTE; (3) GROSS MISMANAGEMENT; AND (4) UNJUST ENRICHMENT |
| Defendants, | |
| And | **JURY TRIAL DEMANDED** |
| CYTRX CORPORATION, | |
| Nominal Defendant. | |

Plaintiff Adam Fishman ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant CytRx Corporation ("CytRx," or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Steven A. Kriegsman, Daniel Levitt, John Y. Caloz, Benjamin S. Levin, David J. Haen, Lauren Terrado, Max Link, Marvin Selter, Louis Ignarro, Joseph Rubinfeld, and Richard Wennekamp (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of CytRx, gross mismanagement, abuse of control, and unjust enrichment for his complaint against Individual Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CytRx, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action which seeks to remedy wrongdoing committed by CytRx's directors and officers between November 1,

2013 and March 13, 2014, both dates inclusive, including the date of the Company's public offering that raised over $80 million and that was completed on or about February 5, 2014 (the "Relevant Period").

2.     CytRx is a biopharmaceutical research and development company specializing in oncology.  CytRx is a Delaware Corporation headquartered in Los Angeles, California.

3.     The Individual Defendants breached their fiduciary duties by having knowingly hired a public relations ("PR") firm that falsely stated it was not paid for the single purpose of promoting the Company and driving up its stock price.

4.     Before CytRx's Initial Public Offering closed on February 5, 2014, and during the Relevant Period, CytRx paid the PR firm, The DreamTeam Group ("DTG"), a known stock-promotion firm with questionable marketing tactics, $65,000.  Among its other services, DTG operates multiple investor websites that entice investors with stock picks that can "trade for at least a 100% profit."

5.     As part of a campaign, DTG, which also operates via its affiliate MissionIR, published multiple supposedly independent articles on sites, such as and especially, Seeking Alpha, under a list of pseudonyms, recommending investments in CytRx.

6.     Consequently, CytRx's stock price began to rise, from a low of $2.06 on November 19, 2013, to a high of $8.24 on January 10, 2014.

7.     In light of the Individual Defendants' conduct, which has subjected the Company to being named as a defendant in federal securities fraud class action lawsuits, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

8.     The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

## JURISDICTION AND VENUE

9.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received

Verified Shareholder Derivative Complaint

substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

12.    Plaintiff is a current shareholder of CytRx.  Plaintiff has been a shareholder of CytRx common stock since before the beginning of the Relevant Period, and has continuously held CytRx common stock at all relevant times. Plaintiff is a citizen of Illinois.

13.    Nominal Defendant CytRx is a biopharmaceutical research and development company specializing in oncology.  CytRx is a Delaware Corporation headquartered in Los Angeles, California.   During the Relevant Period, the Company's stock has been listed on the NASDAQ under ticker "CYTR."

14.    Defendant Steven A. Kriegsman ("Kriegsman") was at all relevant times the Company's Chief Executive Officer, President, and Director.  Kriegman is also a Director of Galena Biopharma, Inc. ("GALE" or "Galena"). Galena was previously a subsidiary of CytRx.  Galena also hired DTG and MissionIR to tout its stock through articles written by third parties and aliases DTG/MissionIR themselves without disclosing that the articles were commissioned and edited by GALE. Kriegsman made a huge illicit profit from selling several million dollars' worth of his GALE stock during the misleading GALE promotion. Upon information and belief, Kriegsman is a citizen of California.

Verified Shareholder Derivative Complaint

15.    Defendant Daniel Levitt ("Levitt") was at all relevant times the Company's Executive Vice President and Chief Medical Officer.    Upon information and belief, Levitt is a citizen of California.

16.    Defendant John Y. Caloz ("Caloz") was at all relevant times the Company's Chief Financial Officer.    Upon information and belief, Caloz is a citizen of California.

17.    Defendant Benjamin S. Levin ("Levin") was at all relevant times the Company's General Counsel, Vice President of Legal Affairs, and Corporate Secretary.    Upon information and belief, Levin is a citizen of California.

18.    Defendant David J. Haen ("Haen") was at all relevant times the Company's Vice President of Business Development.    Upon information and belief, Haen is a citizen of California.

19.    Defendant Lauren Terrado ("Terrado") was at all relevant times the Company's Executive Assistant to the CEO.    Upon information and belief, Terrado is a citizen of California.

20.    Defendant Max Link ("Link") was at all relevant times the Company's Chairman of the Board.    Link was also at all relevant times a member of the Audit Committee and a member of the Compensation Committee.    Upon information and belief, Link is a citizen of California.

21.    Defendant Marvin Selter ("Selter") was at all relevant times the Company's Vice Chairman of the Board.    Selter was also at all relevant times a

member of the Compensation Committee, a member of the Nominating and Corporate Governance Committee, and the Chairman of the Audit Committee. Upon information and belief, Selter is a citizen of California.

22.     Defendant Louis Ignarro ("Ignarro") was at all relevant times a member of the Company's Board of Directors.  Upon information and belief, Ignarro is a citizen of California.

23.     Defendant Joseph Rubinfeld ("Rubinfeld") was at all relevant times a member of the Company's Board of Directors.  Rubinfeld was also at all relevant times a member of the Nominating and Corporate Governance Committee and the Chairman of the Compensation Committee.  Upon information and belief, Rubinfeld is a citizen of California.

24.     Defendant Richard Wennekamp ("Wennekamp") was at all relevant times a member of the Company's Board of Directors.  Wennekamp was also at all relevant times a member of the Audit Committee, a member of the Compensation Committee, and the Chairman of the Nominating and Corporate Governance Committee.  Upon information and belief, Wennekamp is a citizen of California.

### DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers, directors and/or fiduciaries of CytRx and because of their ability to control the business and corporate affairs of CytRx, the Individual Defendants owed CytRx and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to

use their utmost ability to control and manage CytRx in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of CytRx and its shareholders so as to benefit all shareholders equally.

26.    Each director and officer of the Company owes to CytRx and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

27.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of CytRx, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

28.    To discharge their duties, the officers and directors of CytRx were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

29.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CytRx, the absence of good faith on their

8

part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants has been ratified by the Individual Defendants who collectively comprised the CytRx's Board at all relevant times.

30.  As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' knowingly hired PR firms that falsely stated they were not paid for the single purpose of promoting the Company and driving up its stock price.  Accordingly, the Individual Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws.

31.  To discharge their duties, the officers and directors of CytRx were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of CytRx were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)     remain informed as to how CytRx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that CytRx was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

32.     Each of the Individual Defendants further owed to CytRx and the shareholders the duty of loyalty requiring that each favor CytRx's interest and that

Verified Shareholder Derivative Complaint

of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

33.    Moreover, the Individual Defendants, as either officer, director, and/or employee of the Company, were required to comply with the Company Code of Business Conduct and Ethics ("Code of Ethics").  The Company's annual report for the year ended December 31, 2013 filed on Form 10-K on March 5, 2014 with the SEC states that the "Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict, or may be perceived to conflict, with our interests or adversely affect our reputation."  The Code of Ethics itself states, in pertinent part:

> CytRx Corporation and its subsidiaries (the "Company") will conduct its business honestly and ethically wherever we operate. We will constantly attempt to improve the quality of our services, products and operations and will maintain a reputation for honesty, fairness, respect, responsibility, integrity, trust and sound business judgment. No illegal or unethical conduct on the part of our directors, officers or employees or their affiliates is in the Company's best interest. The Company will not compromise its principles for short-term advantage. The honest and ethical performance of the Company is the sum of the ethics of the men and women who work here. Therefore, we are all expected to adhere to high standards of personal integrity.
> ....
> All of our directors, officers and employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior. This Code should also be provided to and followed by the Company's other agents and representatives, including consultants.
> ....
> Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built. All directors, officers and employees

must respect and obey the laws of the United States and of the cities, states and countries in which we operate. In particular, all directors, officers and employees must comply with federal securities laws, rules and regulations that govern the Company.

....

Directors, officers and employees should endeavor to protect the Company's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Company's profitability. Any suspected incident of fraud or theft should be immediately reported for investigation.

....

A violation of this Code by any director, officer or employee will be subject to disciplinary action, including possible termination of employment. The degree of discipline imposed by the Company may be influenced by whether the person who violated this Code voluntarily disclosed the violation to the Company and cooperated with the Company in any subsequent investigation. In some cases, a violation of this Code may constitute a criminal offense that is subject to prosecution by federal or state authorities.

....

Directors, officers and employees should promptly report any unethical, dishonest or illegal behavior, or any other violation of this Code or of other Company policies and procedures, to our General Counsel.

....

Directors, officers and employees are expected to cooperate in internal investigations regarding possible unethical, dishonest or illegal behavior or any other possible violation of this Code or of other Company policies and procedures.

34.     At all times relevant hereto, the Individual Defendants were the agents of each other and were at all times acting within the course and scope of such agency.

35.     Because of their advisory, executive, managerial, and directorial positions with CytRx, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper and false representations made by DTG and MissionIR.

Verified Shareholder Derivative Complaint

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

36.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.   The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37.     During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that the Company paid PR firms DTG and MissionIR for the single purpose of promoting the Company and driving up its stock price.  In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein.

38.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.   During this time, the Individual Defendants caused the Company to pay PR firms DTG and MissionIR for the single purpose of promoting the Company and driving up its stock price and to have the PR firms falsely state that they were not paid by CytRx.

39.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) disguise the Individual Defendants' violations of federal securities laws and

breaches of fiduciary duty, and unjust enrichment; (2) disguise and misrepresent the valuation of the Company; and (3) artificially inflate the Company stock price.

40.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DEFENDANTS' MISCONDUCT

42.   CytRx's Initial Public Offering closed on February 5, 2014 ("IPO"). The total proceeds from the sale of new shares at a price of $6.50 was over $80 million.

43.   CytRx paid stock PR firm DTG $65,000 to promote its stock from November 1, 2013 or earlier through at least February 10, 2014, which is 5 days after the date the IPO closed.  DTG's affiliate MissionIR also promoted CytRx's stock.

Verified Shareholder Derivative Complaint

44.     Either directly or indirectly through DTG and MissionIR, CytRx also retained third parties to promote its stock, including John Mylant and Tom Meyer.

45.     The third parties promoted CytRx's stock through, among other means, pervasive social media postings designed to reach investors and articles written on prominent investor sites such as www.seekingalpha.com.

46.     The promotional articles affirmatively made false statements in stating that the authors thereof were not paid to write them.

47.     At least 13 articles containing said false statements that were promoting CytRx were authored by Mylant and Tom Meyer on different financial news websites, including Seeking Alpha and Forbes, beginning at least as early as November 1, 2013 and past the date of the IPO, at least until February 10, 2014.

48.     Meyer's and Mylant's statements were false because (1) they were paid promoters, and (2) they had a business relationship with CytRx.

49.     Kingmaker, an alias of Meyer, claimed to "run a volatility trading group that focuses on exploiting differences in IV vs. HV[1] in biotech names with upcoming catalysts." The statement was false because "Kingmaker" is an alias used by DTG, which does not run a volatility trading group.

50.     And Mylant claims, both on Seeking Alpha and his personal website, to be a "trader" who has been using a "self-developed option trading system for 10

---

[1] "HV" stands for historical velocity, and is measured as a security's volatility for the previous 30 trading days. "IV" stands for implied volatility, and is an estimate of a security's volatility for the next 30 trading days.

Verified Shareholder Derivative Complaint

years." The statement is misleading because Mylant is an investor relations professional who is paid by companies to tout their stock.

51.   Certain Individual Defendants, including Haen and Terrado, made extensive and substantial modifications to the promotional articles by the third parties prior to their publication.   Thus, those Individual Defendants were also authors of the same promotional articles themselves.

52.   All these promotional articles omitted to disclose that their authors were paid promoters, thus effecting: 1) a violation of Section 17(b) of the Securities Act of 1933, which requires disclosure of an economic interest in the promotion or sale of securities, and 2) a violation of the Company's own Code of Ethics, which requires all Company officers, directors, and employees a) not to engage in dishonest, unethical, wasteful, fraudulent, or illegal conduct or conduct that could damage the Company's reputation, and b) to report to the Company's General Counsel "any unethical, dishonest or illegal behavior, or any other violation of this Code or of other Company policies and procedures..."

53.   While the promotion was ongoing, CytRx's stock price rose from a low of $2.06 on November 19, 2013, to a high of $8.24 on January 10, 2014.

## THE TRUTH BEGINS TO EMERGE

54.   On February 12, 2014, TheStreet.com published an article written by Adam Feuerstein that began to expose how articles written by DTG's employees

Verified Shareholder Derivative Complaint

under false aliases promoted Galena BioPharma, Inc. ("GALE") and failed to disclose that the authors were paid to write the articles ("Feuerstein Exposé").

55.     The    Feuerstein    Exposé    can    be    viewed    here: http://www.thestreet.com/print/story/12327045.html.    The Feuerstein Exposé is incorporated herein by reference.

56.     The Feuerstein Exposé revealed that DTG was paid by GALE $50,000 in July 2013 to run its publicity campaign, including by publishing articles on news websites such as Seeking Alpha and Wall Street Cheat Sheet.

57.     The Feuerstein Exposé revealed that DTG also generally promotes companies on message boards, Facebook, and Twitter.

58.     The Feuerstein Exposé also revealed that DTG was paid by CytRx $65,000 for a year's worth of promotion.

59.     Additionally, the Feuerstein Exposé revealed that two articles apparently written by Kingmaker and Wonderful Wizard to promote GALE, without disclosing that they were paid to write the articles, were published on Seeking Alpha and subsequently removed by Seeking Alpha upon the latter's discovery that Kingmaker and Wonderful Wizard was actually the same person using different aliases.

60.     In fact Kingmaker and Wonderful Wizard are aliases of Tom Meyer, an employee of DTG, who also had articles published about CytRx under various aliases without disclosing that he was paid to write them.

61.     Moreover, those two articles also did not disclose that Meyer, who therein used different aliases anyway, was employed by DTG.

62.     Generally, while DTG has a small disclaimer on its website that indicates that DTG gets paid by the companies that it promotes, DTG's employees promote those companies under various aliases without disclosing that they were paid to write the articles and without disclosing that they were employed by DTG.

63.     On February 12, 2014, CytRx's stock price fell from $6.60 to $6.04, damaging investors.

64.     On March 13, 2014, before market opened, Seeking Alpha published an article written by Richard Pearson ("Pearson") that exposed the misconduct of DTG and GALE and CytRx, each of which hired DTG (the "Pearson Exposé").

65.     The     Pearson     Exposé     can     be     viewed     here: http://seekingalpha.com/article/2086173-behind-the-scenes-with-dream-team-cytrx-and-galena.  The Pearson Exposé is incorporated herein by reference.

66.     The Pearson Exposé revealed that DTG had conducted publicity campaigns for both companies and, through DTG employee Tom Meyer, solicited Pearson to write paid articles to promote GALE and CytRx.

67.     The Pearson Exposé revealed that Pearson drafted many such proposed articles mostly on CytRx and GALE, but a few on other companies, too, and provided his proposed articles to DTG.

Verified Shareholder Derivative Complaint

68.    Pearson did not provide those drafts of his articles to DTG for the purpose of actually publishing them, but only for the purpose of discovering and subsequently reporting to the public and the SEC about the fraud committed by DTG and by the companies that hired DTG to promote the respective companies' stock without disclosing that they were paid to promote their stock.

69.    The Pearson Exposé revealed that Kingmaker, which had published positive articles on both GALE and CytRx, was actually an alias used by DTG employee Tom Meyer.

70.    The Pearson Exposé revealed that DTG had a full team manning stock discussion boards and posting information therein without ever revealing they were paid promoters.

71.    The Pearson Exposé revealed that Management at both CytRx and GALE had day-to-day involvement in the promotional campaigns and control over the statements made in it. DTG's articles on CytRx and GALE were reviewed, edited, and approved by management before they were published by DTG.

72.    When DTG returned to Pearson edited versions of his proposed articles on CytRx, they bore extensive and substantial changes that had been made by the management of CytRx, including VP of Business Development Defendant David Haen and Executive Assistant to the CEO Defendant Lauren Terrado.

73.    The Pearson Exposé revealed that after those articles, which failed to disclose that DTG was paid for writing and publishing the articles, were reviewed,

edited, and approved by CytRx and GALE, they still failed to disclose that DTG was paid for writing and publishing the articles.  Thus, the management of the companies (that were the subject matter of the articles) saw that the articles failed to disclose that DTG was paid for writing and publishing the articles, but the management deliberately chose not to correct such material omissions.

74.   The Pearson Exposé revealed that Mylant, who writes for both Seeking Alpha and TheStreet.com, had worked for DTG since at least November 2013 to promote DTG's clients, which led to the publication on Seeking Alpha of three of his articles on CytRx and one article of his on GALE, each article of which has since been removed from Seeking Alpha.  Mylant confirmed that CytRx and GALE management reviewed and approved his articles before they were published.

75.   The Pearson Exposé revealed that DTG employee Tom Myer used a host of false aliases to promote CytRx and other companies at Seeking Alpha, Forbes, TheStreet.com, Motley Fool, Yahoo Finance, Wall St. Cheat Sheet, etc. Those false aliases include Kingmaker, Christine Andrews (while falsely claiming to be "an analyst and fund manager with almost 20 years of experience"), James Ratz (while falsely claiming to be an "LA hedge fund manager"), John Rivers, James Johnson, Ted Mayer, Wonderful Wizard, Equity Options Guru, and Expected Growth.

76.     The Pearson Exposé revealed that over 100 articles promoting companies' stock that were published by DTG were removed from publication in the aftermath of the Pearson Exposé, including at least 13 articles on CytRx.

77.     The Pearson Exposé revealed that after articles were published by DTG's employees, "Dream Team / Mission IR would then tout the publication of these 'independent' articles on its own website, further pretending that they had been written by independent sources," whereas they were in fact published by DTG's employees under different aliases.

78.     The Pearson Exposé also revealed that Mylant and Meyer also wrote published articles about CytRx under different aliases without disclosing that they were paid by CytRx or that they were employed by DTG.

79.     The Pearson Exposé states in pertinent part:

**Summary**

- Shares of CYTR and GALE both quadrupled during an undisclosed paid promotion via Dream Team.
- Documents show that CYTR and GALE management edited, changed and approved the paid articles.
- At the peak of the promotion, CYTR issued $86 million in new equity while GALE insiders sold personal stock.
- Over 100 Dream Team articles have been removed from various sites in the past two days.
- At least 13 articles on CYTR alone have been removed from publication.

  (Editor's Note: Upon reviewing Mr. Pearson's article, we removed articles from Seeking Alpha that were in violation of our policies. We take author integrity very seriously and appreciate Richard's work in helping us identify authors who were in breach of our contributor Terms of Use.)

Verified Shareholder Derivative Complaint

***Author's Note: At least 13 recent articles covering CytRx have been removed from circulation at Seeking Alpha, Wall Street Cheat Sheet, Motley Fool and Forbes. Many were removed in just the past two days. A list of these removed articles is shown at the bottom of this article.***

....

Below I will provide detailed documentation (emails and attachments) that indicate management from both Galena and CytRx were intimately involved in reviewing and editing the paid articles on their own stock at precisely the time they were looking to sell / issue shares.

Management will have a very difficult time convincing investors that "we didn't know." The articles were provided from Dream Team directly to CytRx and Galena. Management then edited and approved the articles and would have seen the lack of disclosure. When they appeared in final publication there was again no disclosure. And it seems no coincidence that there appears to have been great urgency to get these articles in almost exact proximity to sales / issuances of stock by insiders and the companies at both Galena and CytRx.

....

Galena was previously a subsidiary of CytRx and that the CEO of CytRx also sits on the board of Galena.

....

The undisclosed media promotions coordinated with the release of news and data saw both of these stocks rise from around $2.00 in November to around $8.00 by January.

....

A few weeks ago I received an email and subsequent phone calls asking me to be a paid stock tout for an IR firm called The Dream Team Group ("DTG"). The sender first informed me about an article he wanted on CytRx Corp., and later asked for additional articles on Galena Biopharma, among others.

....

The individual ultimately revealed his name to be Tom Meyer. He later informed me that the IR firm he works for was the Dream Team and that he worked closely with the head of Dream Team, Michael McCarthy. In his initial emails and in subsequent phone discussions, I was offered $300 per article, but was also told that there were two conditions. First, management of the companies would have to sign off (and edit) the articles. Second, I would not be allowed to disclose that I was getting paid.

....

I was told to not worry about posting on Yahoo message boards, because DTG has a full team which handles the posting of numerous bullish messages on places like Yahoo Finance.

....

***With CytRx I was able to receive fully edited copies of the dummy articles which bore the electronic signature of the VP of Business Development (David Haen) as well as by the Assistant to the CEO (Lauren Terrado).***

Verified Shareholder Derivative Complaint

....

Throughout the course of our discussions, Mr. Meyer discussed with me an additional writer who writes for him on CytRx and Galena. His name is John Mylant. Mr. Mylant writes for both Seeking Alpha and for TheStreet.com and has published 3 articles on CytRx and 1 on Galena. (Note: these articles on CytRx and Galena have since been removed from Seeking Alpha.)

Via email and phone I was able to confirm with Mr. Mylant that he was paid by DTG to publish articles on CytRx and GALE and that management had signed off on them because that is what they are paying for.

....

Together, Mr. Meyer and Mr. Mylant have published 13 articles on CytRx since November, some of which had a very dramatic impact on the share price. In addition to doing much writing, Mr. Meyer also appears to have served as the go-between for Michael McCarthy (head of DTG) when coordinating the writing of other authors such as Mr. Mylant when he wrote on Galena.

....

Mr. Meyer wrote:  **"He's [Mr. Mylant] been working for me 4 months or so.** He's pretty good, gets things written pretty quick."

....

Mr. Meyer writes under many aliases, some of whom purport to be hedge fund managers. For example, at Wall Street Cheat Sheet, his bio for "Christine Andrews" states that:

> *Christine is an analyst and fund manager with almost 20 years of investment experience. She covers a variety of industries, with a special focus on technology, and likes to write about value stocks, poorly understood or under-followed situations, and contrarian perspectives.*

The fictitious Ms. Andrews also has had a bio and one article at TheStreet.com. *(Note: The article posted by the fictitious Ms. Andrews at TheStreet has since been removed from circulation.)*

Mr. Meyer also uses the Wall Street Cheat Sheet where he uses the aliases James Ratz (also a supposed LA hedge fund manager), Christine Andrews (shown above) and John Rivers. He also uses his real name there under Tom Meyer to write articles about CytRx. *(Note: Wall Street Cheat Sheet's contributor program was a beta program with just 12 contributors. The site has now removed all articles that it has linked to Dream Team writers, including on CytRx and Galena.)*

Mr. Meyer also has accounts at the Motley Fool under "James Johnson" as well as "Ted Mayer". *(Note: All of his past articles under both of these aliases have since been removed from circulation by Motley Fool.)*

At Forbes he uses his real name, Tom Meyer, but the picture doesn't look anything like the individual I met in person in Chicago. In December, an article at Forbes sent CytRx soaring by nearly 50%, from the mid $4s to almost $7.00. *(Note: Meyer's articles at Forbes have since been removed from circulation.)*

Verified Shareholder Derivative Complaint

....

### *Promoting the promotion - one step further*

An additional feature of interest is that once these articles were published, Dream Team / Mission IR would then tout the publication of these "independent" articles on its own website, further pretending that they had been written by independent sources.

For example, on its website Mission IR notes that:

> CytRx Corp.'s Aldoxorubicin Demonstrates Blockbuster Potential, Says Motley Fool Contributor

It was actually an article written by Mr. Meyer under the alias of James Johnson.

A separate post on the Mission IR blog site quotes the "LA hedge fund manager" James Ratz for his article on Wall Street Cheat Sheet.

Once again, the real underlying author was the same Tom Meyer, who was being paid by Dream Team / Mission IR but without providing disclosure.

Nearly every article written by a Dream Team author gets quoted on the Mission blog posts as if they were written by independent authors.

Finally, on Seeking Alpha he has written under the four names of Wonderful Wizard, Equity Options Guru, Kingmaker and Expected Growth. (Note: All articles linked to Mr. Meyer or Mr. Mylant on CytRx and Galena, along with a number of others, have since been removed by Seeking Alpha.)

....

CytRx management received my articles and then quickly provided feedback, emailed via Mr. Meyer. This was presumably done to maintain the appearance that management was not an active participant and that the process was being entirely orchestrated by Dream Team.

Changes would be run through Michael McCarthy who runs Dream Team. Mr. Meyer let me know that CytRx typically provides heavy changes in these paid articles and that I should not take it personally that their changes to my dummy article were so extensive. Mr. Meyer told me that it would be VP of Business Development David Haen who made most of the changes.

On January 29th, I said in an email:

> man oh man....those were extensive changes. he basically re-wrote about 25% of the article.

To which Mr. Meyer replied:

> Every once in a while a company will be really picky. CYTR is one of them. Our other companies aren't nearly as bad.

> Let me know when you submit.

Verified Shareholder Derivative Complaint

Thx

In fact, it was easy to confirm who made the actual edits by simply using the "Track Changes" feature in Microsoft Word. As can be seen in the pdf files below, the changes were made by David Haen, VP of Business Development and a minor change by Lauren Terrado, Executive Assistant to the CEO. Changes marked "xx" are changes between the two versions of the documents I submitted. One was before the equity offering was announced, one was after.

....

CytRx management was well aware that these articles are being published. They also knew that these have been articles via Dream Team / Mission IR. They were also actively participating in the editing of the articles. Management also should have been well aware that no disclosure was being made about the fact the CytRx management was paying Dream Team and the writers for these articles, or about the editing of them.

**During the time of the offering (in early February), Tom Meyer published two bullish articles on CytRx. To the extent that CytRx management provided edits and paid for this promotion, it raises the risk that investors in this deal and the investment bank involved will feel duped with respect to the exercise of the greenshoe during the offering. This potentially creates the risk that CytRx may not be able keep the proceeds raised in the offering due to potential legal consequences.**

### *CytRx's connections with Galena*

Readers should keep in mind that Galena was originally a subsidiary of CytRx and was later spun out of the company. CytRx CEO Steven Kriegsman is also a director of Galena and recently took in nearly $3 million from selling Galena stock in January, before the recent plunge.

....

At CytRx alone, Mr. Kriegsman has paid himself over $5 million over the past 3 years ($2.8 million in 2013 alone). Most recently, last week he increased his base salary from $700,000 to $850,000 and (oddly) paid himself a spot "retention bonus" of $300,000. So even before his bonus in 2014 he will have already made well over $1 million in up front pay. This is certainly eye popping for a pre-revenue biotech.

Following the heavy media attention on Galena, the Dream Team has removed from its website disclosure on both CytRx and Galena. But the cached pages from search engines still show that the amount paid by CytRx to Dream Team was $65,000. The fact that Dream Team is now removing its own disclosures on CytRx and Galena is telling in and of itself. It is cause for substantial concern.

....

Following the release of Phase 2 data in December, CytRx's share price jumped from as low as $2.19 to as high as $6.79. But the initial move in the stock was only around 80%. Yet (as shown below) this was accompanied by 3 positive articles in a row by Mr. Meyer and Mr. Mylant and the stock continued to soar post-announcement, tripling in 3 days.

Verified Shareholder Derivative Complaint

**Cytrx articles by Meyer and Mylant**



**Cytrx articles by Meyer and Mylant**



....

Asked about the timing of articles coming out in conjunction with a stock offering by CytRx, Mr. Meyer had this to say:

26

Verified Shareholder Derivative Complaint

I had a long conversation with Michael about it. I don't like the fact that the company wanted your article out before the offering. I explained him to that it would make the writers look bad and he agreed. He had a conversation with the company about it.

When asked about this, Michael McCarthy (head of Dream Team) declined to comment.

....

I also spoke to David Haen who provided the edits to the dummy article I sent. He initially stated that CytRx had stopped using the Dream Team several months ago, "when the stock was a $2.00 stock". (Note: that would be back in November, which is when the campaign appears to have begun, not when it ended). When I pressed further he stated that it might have been "earlier this year". As I discussed the editing of documents with him, he noted that CytRx may have provided "some new or original content" to writers but that he felt most of it was for editing for accuracy. Readers can refer to my attached edited dummy article and to the comments which came from Tom Meyer's emails to make their own determination about the extensiveness of Mr. Haen's changes. I did inform Mr. Haen that I would be writing an article on this topic and gave him the opportunity to provide comment.

(Emphasis in original.)

80.     CytRx's stock price fell from $4.80 at March 13, 2014, to $3.61 at the close of March 14, 2014, damaging investors.

81.     The Company stock price closed on July 2, 2014 at $4.17.

## DAMAGES TO CYTRX

82.     As a direct and proximate result of the Individual Defendants' conduct, CytRx has expended and will continue to expend significant sums of money.

83.     Such expenditures include, but are not limited to, legal fees associated with the class action lawsuits filed against the Company for violations of the federal securities laws, and amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigations.

84.    As a direct and proximate result of the Individual Defendants' conduct, CytRx has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the misrepresentations made by DTG and MissionIR, caused to be made by the Individual Defendants, made by certain of the Individual Defendants, and paid for by CytRx.

## DERIVATIVE ALLEGATIONS

85.    Plaintiff brings this action derivatively and for the benefit of CytRx to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of CytRx, gross mismanagement, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof.

86.    CytRx is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

87.    Plaintiff is, and at all relevant times has been, an CytRx shareholder. Plaintiff will adequately and fairly represent the interests of CytRx in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

Verified Shareholder Derivative Complaint

88.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

89.     A pre-suit demand on the Board of CytRx is futile and, therefore, excused.  At the time of filing of this action, the Board consisted of the following six individuals: Defendants Link, Selter, Ignarro, Rubinfeld, Wennekamp, and Kriegsman (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to three of the six directors that were on the Board at the time this action was commenced.

90.     Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

91.     In complete abdication of their fiduciary duties, the Directors either participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price by paying PR firms to promote CytRx without disclosing that they were paid to do so, which included CytRx's management's review and substantial editing of the PR firms' articles before they were published.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors, to increase the Company stock price, and to increase the amount of equity the Company would raise in its IPO.  As a result, the Directors

breached their fiduciary duties.  Thus, the Directors face a substantial likelihood of liability, and demand upon them is futile.

92.    The Directors, as members of the Board, were and are subject to the Code of Ethics.  The Code of Ethics is "applicable to all employees, including our principal executive officer, principal financial officer and principal accounting officer..." The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics required the Directors to also adhere to CytRx's standards of business conduct.  The "Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict, or may be perceived to conflict, with our interests or adversely affect our reputation." The Directors did not comply with the requirements of the Code of Ethics.  The Directors violated the Code of Ethics by causing and facilitating DTG and MissionIR to misrepresent -- and facilitating certain Individual Defendants who also made the same misrepresentations -- that the articles they published about CytRx were not paid for by CytRx directly or indirectly.   Because these Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

93.    The Directors also breached their fiduciary duty of loyalty by failing to ensure that the Company had an adequate system of internal controls in place to prevent the misrepresentations made by CytRx management, DTG and MissionIR

and those they employed and the scheme to artificially inflate the Company stock price.  Indeed, the Directors knowingly or recklessly disregarded any such controls by causing and facilitating DTG and MissionIR to misrepresent that the articles they published about CytRx were not paid for by CytRx directly or indirectly. Accordingly, the Directors breached their fiduciary duties in failing to implement such internal controls and, therefore, face a substantial likelihood of liability. Demand upon them is futile.

94.    Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.  The Board is especially beholden to Defendant Kriegsman, who is not only the Company's Director, but its CEO, and President, and also to Defendants Haen and Terrado, who edited the PR firms' fraudulent articles before publication.  Kriegsman knew about and supported the scheme to pay CytRx's promoters without disclosing it because 1) Kriegsman's officers and employees, including Haen and Terrado, actively facilitated the scheme to cause the PR firms to publish articles with false statements by editing them before publication and paying them, and 2) Kriegsman, a director of GALE, which had been a subsidiary of CytRx, made a huge profit by selling almost $3 million in GALE stock during the exact same kind of fraudulent promotion by DTG of GALE stock at the same time as the fraudulent promotion by DTG of CytRx stock.

Verified Shareholder Derivative Complaint

95.     Members of the Board have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.   These conflicts of interest precluded the Board from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.   Thus, any demand on these Directors would be futile.

96.     CytRx has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for CytRx any part of the damages CytRx suffered and will continue to suffer thereby.   Thus, any demand on these Directors would be futile.

97.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith and intentional, reckless, or disloyal misconduct.   Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).   As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on

behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

98.    The acts complained of herein constitute violations of fiduciary duties owed by CytRx's officers and directors and these acts are incapable of ratification.

99.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of CytRx.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of CytRx, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

100.  If there is no directors' and officers' liability insurance, then the Directors will not cause CytRx to sue the Individual Defendants named herein,

since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

101.   Thus, for the reasons set forth above, all of the Directors, and, if not all of them, certainly a majority of the Directors, cannot consider a demand with disinterestedness and independence.   Consequently, a demand upon the Board is excused as futile.

102.   Overall, the Company will most likely expend millions of dollars in internal investigations and defending the securities fraud class actions.  It may be liable for millions of dollars in damages if it loses or settles the related securities fraud class actions.   Moreover, the Company's reputation has been severely damaged.   The Company has also wasted a substantial amount of money in compensating the Individual Defendants as directors and officers.   Its market capitalization has been severely diminished and its prospect of raising equity in the future is questionable.   All of this substantial damage stems proximately from the Individual Defendants' conscious and willful breaches of their fiduciary duties, abuse of control, and other malfeasance.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

103.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

104.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CytRx's business and affairs.

105.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

106.   The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of CytRx.

107.   In breach of their fiduciary duties owed to CytRx, the Individual Defendants caused and facilitated DTG and MissionIR to misrepresent -- and certain Individual Defendants made the misrepresentations themselves -- that the articles they published about CytRx were not paid for by CytRx directly or indirectly, and failed to properly oversee CytRx's business, rendering them personally liable to the Company for breaching their fiduciary duties.

108.   The Individual Defendants had actual or constructive knowledge that the Individual Defendants caused and facilitated DTG and MissionIR to

misrepresent -- and certain Individual Defendants made the misrepresentations themselves --that the articles they published about CytRx were not paid for by CytRx directly or indirectly and were thus written for the purpose and effect of artificially inflating the price of CytRx's common stock.   Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

109.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

110.   Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and/or omissions were caused to be made knowingly or recklessly.

111.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CytRx has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

## **SECOND CLAIM**

### **Against Individual Defendants for Abuse of Control**

112.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

113.  The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CytRx, for which they are legally responsible.

114.  As a direct and proximate result of the Individual Defendants' abuse of control, CytRx has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, CytRx has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## THIRD CLAIM

### Against Individual Defendants for Gross Mismanagement

115.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

116.  By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CytRx in a manner consistent with the operations of a publicly-held corporation.

Verified Shareholder Derivative Complaint

117.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CytRx has sustained and will continue to sustain significant damages.

118.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

119.   Plaintiff, on behalf of CytRx, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

120.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

121.   By their wrongful acts and the omissions of material fact that they caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, CytRx.

122.   During the Relevant Period, the Individual Defendants either received bonuses, stock options, or similar compensation from CytRx that was tied to the financial performance or artificially inflated valuation of CytRx or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

123.   Plaintiff, as a shareholder and a representative of CytRx, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any

Verified Shareholder Derivative Complaint

performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of CytRx, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to CytRx;

(c)     Determining and awarding to CytRx the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing CytRx and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CytRx and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

Verified Shareholder Derivative Complaint

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of CytRx to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding CytRx restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: July 3, 2014                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com
*Counsel for Plaintiff*

40

Verified Shareholder Derivative Complaint

<u>VERIFICATION</u>

I, Adam Fishman am the plaintiff in the within action and am a citizen of the State of Illinois. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___18___ day of June 2014.


Adam Fishman